The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Craig H.D. Armon presiding. Good morning, counsel. We'll call case number 4-22-1115, People of the State of Illinois v. Mary Vincent. Could counsel for the appellant please state your name for the record? Nathan Swanson for the appellant, Your Honor. Also present next to me is Mr. Scott Rosewood, also for the appellant. Good morning. Thank you, counsel. And for the appellate, could you please state your name for the record? James Ryan Williams for the state. All right. Thank you. Mr. Swanson, you may proceed. Thank you, Your Honor. May it please the court? Counsel. Thank you, Your Honor. On October 15, 2021, Mary Vincent was driving a rental vehicle on Interstate 74 in the state of Illinois. She was pulled over for going three miles above the speed limit. After the officer completed the purpose of the stop, which is to say he completed the warning ticket that he had informed Ms. Vincent that he would be providing her, he asked her for permission to search her vehicle. She denied permission, at which time the officer told her that he was going to detain her until another officer arrived with a canine to conduct a free-air dog sniff. The point on appeal revolves around the propriety of that second seizure, or for a different way, the fact that the officer extended the seizure past the initial purpose, which was to write a warning ticket for going three miles over. Mr. Swanson, could I ask a question? Yes, Your Honor. At what stage in the process did he initiate the effort to obtain a canine? I believe he did call for a canine while he was issuing the warning ticket, so during the stop unduly, and if you go back that far, he had even less indicia of criminal activity than he had after the purpose of the stop was completed. But for cleanest argument, we can point out that once the purpose of the stop was completed and he initiated effectively a second detention, that puts very clear guardrails on the situation. But we have videos of the stop, so I'm sure you know the times involved. Like, the time between the actual stop itself and the time that he first called for a canine. Your Honor, I do have the notes for that. I don't have it necessarily right on me, so I'd have to call back and double-check it. If you'd like, I can, but... No, it's okay. I was just wondering if you happen to have them. And I apologize, I do not. That's okay. Go ahead. I will have them during the appellee's argument. So, during the course of the stop, what information did the officer develop that would justify extending the detention for a dog sniff? That's essentially the issue here. Well, very simply, what did he know? He knew that Ms. Vincent was driving from a rental car, although he didn't find the fact that it was a rental car at all important. He didn't mention that as something that drug was driving from Northern California, and that Ms. Vincent indicated that she was driving towards Ohio. Apparently, he testified that Ohio was a target for marijuana traffickers, but it's also a major American city, so suggesting that would encompass a large category of otherwise innocent travelers. He knew that Ms. Vincent apparently had not used the trunk. He testified that he saw her luggage in the backseat. So, again, that is incredibly common. Unlike... Did he say there was luggage in the backseat or that there was no luggage in the backseat? No, that was actually a point in the brief. The testimony at the suppression hearing was that there was luggage in the backseat, but referring to the video, after the officer makes his initial contact and he's walking backwards to his car, and you can hear him say, presumably for the benefit of the recording, a dog in the car, and it sounds as if he says no luggage. When he is interviewing Ms. Vincent in the vehicle or in his patrol vehicle, he asks her, is everything in the car yours? She says yes, and then he says, including the luggage in the trunk. So, I'm sorry, Aaron. No, please go ahead. I'm just clearing my throat. Mr. Swanson, just in that regard, I looked at the transcript of the hearing, the trooper's testimony. To me, it's not clear whether he was saying that there was, at the time of his testimony, that there was luggage in the backseat or not. Is there a clear statement in that testimony? Your Honor, I have to refer to that. There may not be, Your Honor. I think the import of it was he suggested that there was luggage in the trunk and she hadn't opened the trunk. I'm sorry, not luggage in the trunk, but there was luggage in the backseat, but she hadn't opened the trunk. But as pointed out in the brief, she testified that she had been staying at hotels. If you calculate, essentially, the time for traveling from where she began to where she ended up, that would be consistent with a hard drive as there was in the office. So, counsel, excuse me, good morning. To finish your answer, I apologize. Is there anything else you want to add to your answer? The only thing I was going to add was it's not clear that the trial court relied at all on the presence or absence of luggage in the backseat. So, whichever way the officer testified about it or what occurred, that's not a contributor to his suspicion of criminal activity. Thank you. I'm sorry I had interrupted. I had a question. If we're looking here at whether the circumstances raised a reasonable suspicion of criminal activity, and you mentioned earlier that there were some factors that seemingly were consistent with an officer, I mean, when an officer observes multiple supposedly innocent factors, but each of them in his or her experience, and here this trooper had many years of experience in interdiction stops, doesn't that suggest and couldn't that suggest criminal activity and didn't it suggest criminal activity here? So, to the general questioner, certainly, and I think the state cites to the Arvizu case from the United States Supreme Court, it has been held that multiple factors that in and of themselves are innocent can pile up into a circumstance that are suggestive of criminal activity to an officer's training and experience, but the casebook from this district and other districts in Illinois, Thomas being one of them, cites that when all of the factors that you're piling up would encompass a broad swath of otherwise innocent travelers, effectively subjecting innocent travelers to random stops, that's insufficient. So, in this case, so the Arvizu case, for example, that involved people in a minivan on a dirt road that was rough with children in a place near the border driving from a low, you know, driving into just a very odd location and the argument was, well, maybe there's an explanation for that. That's one end of the spectrum, but what we're talking about here is a person on a road trip using the interstate with a dog in the car. That is a much, much broader category. Now, the officer testified that he has seen drug traffickers use a dog, but lots of people travel with the dog. He's seen people travel from that area to other places carrying marijuana, but again, the purpose of the interstate is for people to drive interstate travel. If this officer has sufficient indicia of criminal activity to initiate a stop, then there's always going to be enough to stop somebody if that person is traveling interstate. Right, but we're not talking about the stop here. You agree there was, she admitted she was speaking, so we're not focused on this. We're focused on the extension of the stop, correct? After the of the stop was completed. Absolutely, yes. So, and so I used in a or in specific phrasing there, if this was enough to extend the stop, then there will always be enough time to extend the stop, then anybody who stopped while during interstate travel will have a reason for it. Now, I would also point out that some of the... Right, but it's not just, excuse me, it's not just a reason, right? What does the case law require? It requires that the officer must have a particularized and objective basis for suspecting criminal activity, correct? Correct, but that... Go ahead, go ahead. But that particularized and objective basis can't, the case law, extend so that it encompasses a broad category of otherwise innocent travelers. That was the whole thing in Thomas Ortiz going back. But if that officer looks at a number of factors, isn't it the totality of the circumstances that that officer can consider, even if it's innocent conduct, that would lead to the reasonable suspicion? It is, Your Honor, but I think the point of it would be that the innocent conduct, all added together, all put together, if that in and of itself is indenture of a criminal act, which is kind of a hard thing to parse, if I may. That's why I point to the RV suitcase. It wasn't that, you know, normal people or innocent people don't drive a minivan or go on a picnic or travel with their children or wave oddly, which are all factors in the RV suitcase. It was that under the circumstances, all of those innocent things were problematic. Mr. Johnson, I would suggest, though, you're compartmentalizing what took place when, in fact, it's a continuum of events. There may be what you refer to as, and what I would acknowledge, are innocent circumstances or behaviors. But as this squad car with her, there is more information coming in. There's more taking place. Doesn't all of that add to his determination as to whether there's a sufficient basis for having the canine come and a sufficient reason for the dog sniff once he gets there? Well, certainly if there were additional factors, but you're talking about what he learned during the course of that interview. He already knew, according to his testimony, although it wasn't reflected in his report, where she was driving from. Sure. But he finds out that the plates are expired. So there's an inquiry about that. And certainly the extension of the stop to figure that out, but she provided him a valid rental agreement. Sure. He's allowed time to look at the rental and he had a discussion about the expired plates. He did. And he did not testify that the expired plates were indicia of criminal activity or drug trafficking. Right. But as a court of review, we're allowed to look at all of the factors that might have been in front of the court, whether the court considered them or not, aren't we? Certainly. But there was no testimony that those factors would have suggested to the officer that there was drug trafficking or was his. Was it reasonable taking into account? Was it was there an objectively reasonable basis taking into account all the factors that were in front of the officer? Yes, you're right. But whether they were relied on by the trial court or not. Yes. I'm sorry. I may have maybe I answered unclearly. But if the officer says I noted something, but there is no testimony before the trial court or on the record that that behavior or that thing that he, quote, unquote, noticed was indicative of criminal activity. So he may have noticed that she was wearing a white shirt or that she the dog was a German shepherd or whatever it might happen to be. But if he doesn't then use that in this training experience to conclude that criminal activity is afoot, then to even as a court of review to say that is a factor he relied on would be to give would be to read into the record something that's otherwise not present. So, for example, when he says that he, you know, using the expired place as an example, certainly he could extend the stop to investigate the expired place. He can send stuff to ask for the rental agreement to confirm that said, you know, to ask Miss Vincent about where she rented the car, driving pattern, all of those things. There's no question about that. But there's nothing in the record to suggest that in this officer's training experience, which is the that renting a vehicle with expired plates is indicative of criminal activity such that it permit him to again, you're compartmentalizing. And I think that that's not a fair analysis. You can't just take out one factor and say, well, now, see, this is there's a perfectly innocent explanation for that. So we have to discount that. No, it's a cumulative, as Justice Zinoff indicated, is the totality of the circumstances. Now, during that same period time, he learns that she's just made the same trip six months before. Right. Correct. And he did take that into account. He did. He did say he did take note of that. Yes. OK. He also learned that she did have prior convictions involving marijuana. Correct. He did. Yes. And I believe they were fairly they were fairly further back. But yes. Sure. But that, too, was taking place during the time that the stop was still in its legitimate, in your analysis, in its legitimate period of delaying her, correct? Yes. OK, go ahead. And then just to follow up on that, the court trial court didn't make any findings of fact with respect to those factors that Justice DeArmond was just referring to, did it? Correct, Your Honor. There's no indication of which factor or which facts the trial court believed or did not believe, the points that were kind of debatable. OK. He also and but this is where Thomas, I think, comes in, Your Honor. And the in Thomas, that gentleman was driving from , say, Washington to Arkansas. He was engaged in hard driving. That was the testimony, which is not present here. He was nervous, which, again, is not present here. There was some question about whether he had sufficient luggage, which is broadly analogous to what is here. Obviously, there was no dog in Thomas. The and this court conclude under a totality of the circumstances that all of those added up either nothing or very little to a suspicion of results should be the same. She's driving cross-country from a place where there are people who have marijuana, but the officer doesn't testify that there's anything about her going back and forth. And I'm not trying to mentalize it. It's that when he says that he notes these things, certainly he would know these things. He's an officer. He's supposed to investigate and collect facts. And he should be aware of what's going on. But there's never anything that suggests what he's noting is indicative to him of criminal activity. He's just noting the facts that he noted. So the dog being named Doobie, he says, in a law enforcement context, that means marijuana. But again, he notes that. But in his training experience, what does having a dog named Doobie mean? In his training experience, what does it mean to have a rental vehicle that happens to have an expired plate? She's not nervous. She has no contradictory answers about what she's doing, where she's going. There's no order of marijuana. The fact that she has prior convictions of some at some point, he doesn't say that she doesn't deny it. He doesn't say that she gave a contradictory answer about it. Certainly it can be a factor in this. But to suggest that he, even in the course of the entire stop, developed enough information to continue a detention of her past the time that the purpose of this initial stop was completed, is to suggest that effectively, anybody engaged in a cross country trip can be pulled over and held until a dog gets there. Now, counsel, the state argues that Thomas really is distinguishable. How would you respond? You've talked about some of the factors in Thomas, how do you respond to the state's argument that that case really is not in essence on all fours, or we shouldn't rely on that case? Well, I think when you look at Thomas, what are the points of distinction between this case and Thomas? In Thomas, the officer or the defendant was driving from the state of Washington. In this case, the defendant was driving from the state of California. There's a little bit more testimony here about that being a source state for marijuana and Columbus being a target state for marijuana trafficking. But that doesn't necessarily add that much additional to it. There's some difference in the question about where the luggage was present. In Thomas, the issue was that the luggage was insufficient for the journey. In this case, there's a question about where the luggage was actually present. But the officer's testimony was about the lack of grime on the trunk and marijuana traffickers keep their marijuana in the trunk. But there's nothing inherently criminal about not opening a trunk, especially if the luggage is actually in the car. In Thomas, there was obviously no dog. Here, there was a dog. He did testify that drug traffickers occasionally traveled with dogs. He noted the name of the dog being a homophone for a small amount of marijuana, also a homophone for a, again, fairly famous cartoon dog. But again, these are just small factors. Then comes a huge, huge swath of the innocent public. And there were also points in Thomas that are not present here. Specifically, in Thomas, the defendant appeared nervous, which is a well-known thing that officers rely on when they make contact with a person who's engaged in criminality. In Thomas, the defendant gave some odd statements about the hard driving that he had been driving straight through that didn't make sense, that he was eating lots of fast food and energy drinks, none of which is present here. But in Thomas, that was testified to as a point that drug traffickers will often sleep in their car, drive hard, eat fast food, consume energy drinks just to make it all the way through. But there was, I think, some question about the traveling to see his daughter, whether the defendant had enough luggage for it again. Nothing present here. So is this case identical to Thomas? No. But the broad point of Thomas was everything the officer talked about was equally applicable to innocent people. And to find that was sufficient would encompass all of these people. Not that they were susceptible to innocent explanation. And I'm not going to smash the sentence. But that it would basically mean that innocent people could be detained just at random. And that is the case here. If this is sufficient, those innocent people get detained. Thank you, Mr. Swanson. You'll have an opportunity on rebuttal.  Counsel, my name is James Wright Williams, and it's my privilege to represent the state before this honorable court. So in this case has been thoroughly discussed, the basic question is whether there was reasonable suspicion that justified prolonging the search, or excuse me, prolonging the detention for approximately four minutes beyond the time necessary to issue the written warning. And here, the state's position is, is that the various circumstances before the trooper amounted to more than a mere hunch. And again, that's the standard that we're working with is it just simply has to be more than a mere hunch. And here, the officer had more than a mere hunch based on, again, the circumstances, and then, of course, his considerable law enforcement training and experience, which included the fact that he was an 18-year veteran of the Illinois State Police. He had been involved in over 100 what he described as class X level drug trafficking cases. The defendant here is driving a rental car with a Nevada plate, which I believe that the test that the trooper testified that driving a rental car is consistent with drug trafficking, although that was disputed a moment ago. But of course, we also have the fact that the defendant is driving from Northern California to Columbus, Ohio, which the officer testified is a very common route for cannabis trafficking. And in fact, it's well known that Northern California is arguably the cannabis cultivation mecca of the entire world. And the trooper testified- So, counsel, excuse me. On that point, I'd like to stop for a minute and look at a couple of these factors that the officer said he relied on. And I indicated in my question, one of my questions to opposing counsel, that we know that the officer has to have a particularized and objective basis for suspecting criminal activity. So, with respect to driving from California to Columbus, is it your position that anytime someone is driving from California to Columbus, that contributes to reasonable suspicion of cannabis trafficking? No, Your Honor. Again, as many courts have held, a lot of times there are perfectly innocent explanations for these things. But again, we're looking at the totality of the circumstances. So, that coupled with the other circumstances known to the officer at the time- Mr. Williams, Justice Enum, very pointedly said contributes. Is it an additive factor? Yeah, the state's position is it would be a fair consideration. Again, you're- All right, but let me- I know I'm interrupting you, but I think it is important to try to look at each of these separate factors that were relied on and see if when we get to the end, we've got the totality of the circumstances that add up to a reasonable suspicion, or whether innocent plus innocent plus innocent equals no reasonable suspicion. I mean, this is, I don't think, an easy analysis here in this case. And that's why I wanted to take a couple minutes to do this. So, under your position, again, just with this one point, wouldn't travel then to any city where there's drug activity contribute to reasonable suspicion? Well, on that point, Your Honor, I would point out that the officer here actually specifically testified that Columbus, Ohio is a very common destination for cannabis trafficking specifically based on his training and experience. So, I would say that that makes it a little bit more of a consideration than just any given city. But we know there's not just one city that is known for drug trafficking, but I accept your reply to my question. Let's look at the factor that the officer felt that the trunk had not been accessed since the time she rented the car. As far as this trooper knew, at the time of the stop, that grime could have accumulated at any time, correct? Even just a couple hours before the stop. So, how is there any objective particularized basis for the conclusion that the officer drew with respect to this factor? Again, Your Honor, perfectly innocent explanation. She simply didn't get into the trunk, but it was just one piece in the totality of the circumstances that caught the officer's attention based on his training and experience. Of course, if you're driving across country with a trunk load of cannabis, it's perhaps not unsurprising that you might not access that trunk during the duration of that trip. Right, but he didn't know when. I mean, he had no idea when that trunk, when the grime landed on the trunk, right? I believe he testified that it had accumulated. But he didn't know if it accumulated a couple hours before or when she started, isn't that correct? Yeah, again, as I've conceded, there certainly is an innocent explanation there, it's just one piece in the totality of the circumstances. All right, but I think we've got to look at each piece. And then with respect to the dog, I mean, certainly, wouldn't you agree that it isn't uncommon for individuals who are driving a long distance to travel with a dog if they own a dog, isn't that right? I mean, if they don't want to board the dog, if the dog isn't comfortable being left with friends, I mean, it's not uncommon, is it? No, and I don't mean to keep repeating myself that, again, there are innocent explanations, but at the same time, the totality of the circumstances, we have a dog that's named Doobie, which of course is a common cannabis reference. And the officer did specifically testify that it's very common for drug traffickers to travel with dogs to like essentially throw off the canine unit. Right, but he said that he thought it was. I think he, my recollection of the testimony, which I recently reread, was that I don't think he necessarily testified that it was in his experience that he had found that. He thought that was the case, but I don't think he talked about any specific experience he had with that, nor naming the dog Doobie. Did he? I mean, is that your recollection? I don't remember reading that in the record here. I don't remember to your first point about whether he talked about within his training and experience that drug traffickers often use drug dogs. I thought that he did, but again, I don't remember the precise testimony. Didn't he indicate that he was aware of that from his training and experience, but that he had no personal experience with? I don't, I'm sorry, your honor. I don't recall precisely how he phrased when answering that question. But I do think that he did specifically reference that the dog was named Doobie, which was a, I think he testified that it was a reference to a small amount of cannabis. All right, and I just have two other factors I wanted to ask about quickly, please. His conclusion that driving would be less expensive than flying. Here, it was really a factor based on his own personal opinion, rather than experience, was it not? That it would have been preferable to fly. Here, the defendant replied that she couldn't get a this really was not an objective particularized conclusion that he made with respect to this factor, was it? Well, again, and I am just repeating myself and I apologize, your honor. No, that's fine. The defendant did provide, oh, I'm sorry. The defendant did provide, of course, an innocent explanation for, a perfectly plausible explanation, frankly, for driving cross country because of the inability to fly with the dog. But again, that could have simply been a lie or an excuse. And so perhaps not a major contributing factor, admittedly, but nevertheless, at least a small piece of the indicia of reasonable suspicion. All right. And then finally, with respect to the other factor, whether the criminal, prior criminal activity was particularized enough here to raise a reasonable suspicion, did Sweeney himself acknowledge that he decided to detain her before he learned about this criminal activity in the past? Well, I believe that the dash cam footage would be indicative of that as well, that he had. But of course, I mean, we're, even before he articulates his suspicion, we're dealing with laws that, for example, you know, the drug dog has to get there quickly. So if he has any suspicion whatsoever, I'm not sure that I see a problem with the officer, you know, early on before he's gotten even greater indicia of criminal activity. Nevertheless, getting the drug dog on the way, because, of course, if he, you know, the way the law is, if he detains that person for even a minute beyond the time necessary for, you know, the purpose of the stop here issuing the warning, then, of course, that gets, that requires additional suspicion of criminal activity. So I don't know that there's anything inherent, it doesn't strike me as inherently wrong that the officer would at least have the dog on his way, whether or not he has reasonable suspicion at that point or not. Okay, my final question then, really, and then is, if each of these factors that we've talked about could be consistent and apply to a large category of innocent individuals, how could they, even in their totality, raise a reasonable suspicion? Well, again, Your Honor, what we're dealing with here is reasonable suspicion, which is essentially nothing more than a mere hunch. And here this officer didn't simply have a hunch that this person was, and notably, the hunch was correct, but the officer didn't have just a mere hunch that this person was trafficking cannabis, but had these various factors that admittedly may have innocent explanations, but together amounted to more than a mere hunch. Counsel, with all due respect, I'm not sure that that really is responsive to what I'm asking, looking for, and trying to discern, really, in my own mind. If we have innocent activity, innocent activity, innocent activity, etc., how do we get to reasonable suspicion and not a hunch? Well, I believe that there's case law that holds that even if each of the factors have an innocent explanation, they can nevertheless collectively amount to reasonable suspicion. And how do we get there? Based on what? I think that's just what existing case law holds. Now, you've raised an interesting point when you make the point that it's not just innocent activity, but innocent activity that encompasses a large swath of the commuting public. So that's, I think, perhaps a slightly different question. But nevertheless, like I say, the state's position is we're simply relying on existing case law that allows for innocent activity to nevertheless culminate in reasonable suspicion. Unless this court has any further questions. I do have a question, Mr. Williams. In regards to the timing of the elicitation of the criminal history from defendant relative to the issuance of the warning ticket, when did the trooper ask the defendant about any prior criminal history relative to he had issued the warning ticket? I do not know the timing of that, Your Honor. I would note as a practical matter, he may well have been aware of that criminal history prior to actually asking the defendant from it, just from running it through the lead system. The sequencing. I'm sorry, Your Honor. I interrupted you. Oh, no, no. I was just apologizing. I don't recall the exact sequence of events that you're inquiring about. My apologies. It's on the recording, and I know we can go back and listen to it. But as I recall, he asked her if she has a prior criminal history, and she said, oh, way back. And he said, oh, good, good, or something like that. But he was also notified over the radio, as I recall, of being informed of what her prior criminal history consisted of. And I guess it would be, were either of those two things provided to him before he issued the warning ticket? And I'm using that point in time to mark when the second detention maybe began. You're correct, Your Honor. And that's, I think, a valid consideration. Again, I don't know the exact sequence of events. It may have been the case that he got it from the radio. At the same time, it might be important to look to his testimony to when he may have learned that, because a lot of times officers, of course, will ask a question like that just to see if the person lies, even though the officer already knows, you know, through the lead system or whatever, that the person does have a criminal history. So it may be important also to look at the officer, or the, excuse me, the trooper's testimony with respect to when he learned of the defendant's criminal history. Thank you. All right. Thank you for your time, Your Honors. Thank you, Mr. Williams. Mr. Swanson, rebuttal. You're on mute. Sorry, Your Honor. Very briefly, Your Honor, earlier you asked at what point did the officer request a canine? That occurs at 522 in the stream, which is about three, four minutes into the detention. At that point, the officer knew nothing besides Ms. Vincent had driven from Northern California to there, and it was, there were expired plates. He did not, he had seen the presence of the dog, but had very little else. He didn't have her criminal history at that point. He didn't have the, he finds out immediately after that, that she made this trip previously. But to the extent that that extent, that requesting a canine under those circumstances were, extended the purpose of the stop, that could also serve as a Fourth Amendment issue. Mr. Swanson, just in that regard, you have a very experienced trooper here who's been involved in many drug seizures. He knows the clock has tickened there, and he calls for that canine early on in the stop, potentially because he knows the clock is ticking and he doesn't want to have a prolonged seizure after he issues the warning ticket. But can you hold that against the state here? Yes, you know, I'd argue absolutely can. The question about the issue in Rodriguez was, now, and I realize that when you get down to seconds, you're almost bringing this to a reductio ad absurdum, but the point of Rodriguez was that when an officer deviates from the legitimate purpose of the stop, that's the constitutional violation. If it results in a delay. If it results in a delay. Right. So if he calls ahead of time, and he hasn't complained, and there's no indication that he's actually purposely extended the normal purpose of his stop, as long as the canine gets there within that period of time, what's the Fourth Amendment issue? Well, Your Honor, so I think the issue there would be if the canine arrives during the course of the stop, then the Fourth Amendment issue is, was the request for the canine in and of itself a delay? Or is he doing other things to delay the stop so that the canine could get there? But as long as there's no indication that there's any delay built into the mix, just calling for the canine by itself, how can that be used against the state? So we said a second ago, is there any indication of a delay? In this case, he requests the canine before he has anywhere near sufficient information. And then he proceeds to ask questions to justify the presence of the canine. But that goes back to Justice Harris's question. Right. What's wrong with that? As long as it doesn't end up extending the period of time, if the dog actually gets there, and by that time, he has developed in his mind, reasonable suspicion, what's wrong with that? Because, well, how would you ever parse the difference? So in this case, for example, if he calls for the canine four minutes into the course of the stop, and then proceeds to ask a series of questions about where she was coming from, why she was doing it, what's the dog's name? Have you ever been in trouble before? Until the case, so that the stop is delayed such that the canine gets there. Or in this case, you're, you're always building in a delay, I'm saying, if we start from a premise that there is no, and I'm not, I'm not talking about this case, I'm talking about a hypothetical. Okay. If we start from the premise that there, everyone agrees, there is no actual delay, I want to get back to Justice Harris's question. If there is no delay, just because he calls for canine at the outset of the stop, does that fact in itself somehow work against the state? I think in that hypothetical, a argument could be made that the two second delay in of itself constituted a Fourth Amendment violation, because it's some the two seconds, essentially to ask for the dog, even without any reason to do so. That constitutes a incredibly de minimis delay. But it's a, I would absolutely know that would be a hard road to hoe, to try and make that argument. You were doing much better before that. Thank you. But in this case, we know that he really couldn't get a dog that weren't dogs available to to come right away, they really had to make a couple different calls, the dispatcher to find a dog that would come and the dog did not come within that period of time before the stop was extended. Isn't that correct? That's absolutely correct. Yes. And I think that would also go ahead and answer. I think that would absolutely color the officer's testimony as anything else and put it into a certain light about what was the purpose of the questions he was asking. I think that establishes all that he was making a delay. And if I just make one final point, just your point, as I understood it to the state was, if we have innocent and we have innocent and we have innocent, how does that then at some point become reasonable suspicion of criminal activity. And I think what the case I would say is something that's independently as independently as independently as it can be articulated as as suspicious under certain circumstances. But the point of Thomas and the prior cases that say the innocent people is that if all you have is if all you have is innocent behavior altogether. Without any circumstance, circumstance that makes it criminal, such that you're going to get a wide variety of people, that's insufficient. And that's what happened here. Thank you, counsel. The court will take it. We do appreciate your arguments. The court will take this matter under advisement and the court stands in recess.